46 N.J. Super. 497 (1957)
135 A.2d 38
STATE OF NEW JERSEY, PLAINTIFF,
v.
SOUTH AMBOY TRUST COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided September 6, 1957.
As Amended September 13 and October 3, 1957.
*500 Mr. Grover C. Richman, Jr., Attorney-General of New Jersey (Mr. Christian Bollermann, Deputy Attorney-General, appearing), attorney for the State.
Messrs. Toolan, Haney & Romond (Mr. John E. Toolan, appearing), attorney for the defendant.
HUGHES, J.S.C.
In this action of the State of New Jersey against the South Amboy Trust Company, the plaintiff has brought on a motion for summary judgment on two counts of its complaint. It suggests that under R.R. 4:58-3 the record of the pleadings, discovery proofs and affidavits palpably negates the existence of a genuine issue as to any material fact challenged, entitling the movant to judgment as a matter of law. The prerequisites for the granting of such summary relief are well-known. They require that a discriminating search of the merits in the pleadings and proofs on file clearly establish the absence of any genuine issue of material fact requiring disposition at a trial. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954). The summary judgment is not to be considered as a substitute for a plenary trial of the issue, if there be any such genuine issue (Battle v. General Cellulose Co., 23 N.J. 538 (1957)), and is to be granted with circumspection, since its allowance defeats the asserted right of a litigant to such plenary trial of the merits. Devlin v. Surgent, 18 N.J. 148 (1955). It is for this reason that the burden of establishing, beyond a reasonable doubt and with the utmost clarity, the right to summary relief is upon the movant, and that the court must view with critical *501 discernment the body of proof advanced in support thereof. Monmouth Lumber Co. v. Indemnity Insurance Co. of North America, 21 N.J. 439 (1956). All inferences of doubt are drawn against the movant and in favor of trial. West Side Trust Co. v. Gascoigne, 39 N.J. Super. 467 (App. Div. 1956). Yet the right to summary judgment is a substantial one where circumstances warrant, and is more than a token procedural remedy under our rules, for it not only affords protection against groundless claims and frivolous defenses, saving the antagonists the time and expense of protracted litigation, but it also reserves judicial manpower and facilities to cases which meritoriously command attention. Asbill and Snell, "Summary Judgment Under the Federal Rules  When an Issue of Fact is Presented," 51 Mich. L. Rev. 1143 (1953).
It follows that in examining the record here to determine whether the issue is thus ripe for summary disposition, the court must have particular concern for the balancing of these opposing philosophies of the judicial process brought into focus by the summary judgment procedure, exercising caution to avoid a precipitate stifling of trial of the issue and yet not hesitating to afford protection against frivolous litigation. Robbins v. Jersey City, 23 N.J. 229 (1957).
The issues framed by these pleadings are immediately arresting to the attention, for they embrace a situation of such unusual nature, fortunately, that search for a comparable precedent is difficult. In pursuance of its sovereign functions the State of New Jersey empowers its State Treasurer to receive and disburse moneys of the State, R.S. 52:18-11, holding the same on deposit in national banks or in banks authorized to do business in this State, which must be located in the State, R.S. 52:18-17, 18. He is bound, inter alia, to prepare on a quarterly basis a record showing the balances of state funds on deposit with each bank, which is to be a public record, R.S. 52:18-21. With the exception of specific moneys, such as the State School Fund, certain federal appropriations and other funds of particular characteristics or source, or dedicated to particular *502 uses, R.S. 52:18-30, the statute requires that all moneys of the State collected or received by any state institution, board, commission, department, committee, agent or servant, from any source, shall be paid into the State Treasury, R.S. 52:18-29. Generally speaking, these moneys are expended from the State Treasury for general purposes to which they have been appropriated specifically by the proper authority, R.S. 52:18-27. This pattern applies to moneys received pursuant to laws relating to motor vehicles, R.S. 52:18-32; L. 1918, c. 153, sec. 2, p. 449. The same custodial formula applies to the fund known as the State Disability Benefits Fund created by L. 1948, c. 110, p. 602, sec. 22, although as will be seen this fund is dedicated to specific purposes. Since this statute is a focal point in the controversy here involved, its pertinent provisions should be noted:

"N.J.S.A. 43:21-46. State disability benefits fund.

(a) The State disability benefits fund, hereinafter referred to as the fund, is hereby established. The fund shall remain in the custody of the State Treasurer, and to the extent of its cash requirements shall be deposited in authorized public depositories in the State of New Jersey. There shall be deposited in and credited to the fund the amount of worker and employer contributions * * *. The fund shall be held in trust for the payment of disability benefits pursuant to this act, for the payment of benefits pursuant to subsection (f) of section 43:21-4 of the Revised Statutes, and for the payment of any authorized refunds of contributions. All moneys withdrawn from the fund shall be upon warrant signed by the State Treasurer and countersigned by the director of the commission or by such trustee of the fund as may be designated by the commission. The Treasurer shall maintain books, records and accounts for the fund * * *."
(This statute by amendment now provides for countersigning by the Director of the Division of Employment Security of the Department of Labor and Industry of the State of New Jersey.)
The defendant is an institution authorized by this State to carry on a banking business, and hence an authorized depository of state funds. Another such authorized depository is the Trenton Banking Company, and in that bank on December 21, 1949 there remained on deposit $300,000 of the disability benefits fund created by the statute. It was *503 intended by the State to transfer this amount of the fund, for deposit, to the defendant bank, and a warrant check was signed and issued by the State Treasurer for that purpose and was countersigned by the Director of the Commission (who was then Harold G. Hoffman, since deceased). This warrant check contained an endorsement by the Treasurer, without restriction, to the order of the defendant bank, but on its face it contained these two significant legends:
"For Transfer of funds from the Trenton Banking Company for deposit to the South Amboy Trust Company, South Amboy, N.J."
"State Disability Benefits Fund B"
This warrant came into the possession of the defendant bank, which admittedly collected the proceeds from the Trenton Banking Company.
On January 5, 1955 a new State Treasurer sought to transfer this fund from defendant bank to the said Trenton Banking Company for deposit and issued a warrant check in the amount of $300,000 for that purpose, which was appropriately signed and endorsed and which contained these legends on its face:
"For Transfer of Funds from South Amboy Trust Co. to the Trenton Banking Co., Trenton, N.J. (State Disability Benefit Fund B)"

"B STATE DISABILITY BENEFITS FUND"
The defendant (although no part of this fund had been withdrawn, as such, by the State in the interval) refused to honor this draft on the ground that the State had no such account in its bank, and it was this repudiation which was the immediate precipitating factor in this action by the State to recover such amount. But there was a reason for such refusal to honor the later warrant, and the record unambiguously suggests the basis for the bank's position. Despite its infirmities, which will be discussed hereafter, this same record reflects a story of corruption as unpleasant *504 to contemplate as it is difficult to believe. It establishes beyond doubt a systematic looting of state funds beginning a quarter of a century ago, and accomplished by a technique which, though not developed in the fullest detail by the proofs submitted, was manifestly (in any possible aspect) so simple and discoverable that its successful concealment over the years is quite startling.
The 1949 transfer of proceeds of the disability benefits fund account above mentioned was not the only instance in which the defendant acted as a depository of state funds. From at least April 1930 to the present time it has held on deposit many millions of dollars of the funds of the State involving at various intervals multiple accounts, including one first known as the account of "Harold G. Hoffman, Commissioner of Motor Vehicles," and later as the Motor Vehicle Fund, another account known as the State Fund, and one known as the General Treasury Fund (which still exists and in which defendant presently admits it holds $700,000 on deposit). Additionally, there was the State Highway System Fund, the Motor Fuels Tax Fund, the School Relief Fund and the Grade Crossing Elimination Fund. Finally, there is the Disability Benefits Fund, the existence of which the State declares and the defendant denies.
The Motor Vehicle Fund above referred to began with a deposit of $1,455.50 on April 5, 1930, and in the nine years of its existence there passed through it amounts in excess of $16,000,000. In 1930 said Hoffman was Commissioner of Motor Vehicles in New Jersey and he was also then treasurer of the defendant bank, having been an officer thereof since its organization in 1919. Testimony in this record indicates that he was "in charge of the bank" as early as 1924, and when he died he had been its president for some four years. During the interval he variously had been executive vice-president and vice-president. While Motor Vehicle Commissioner, according to testimony in this record, he designated the banks into which deposits were to be made, including the bank of the defendant. He rose *505 to be elected Governor of New Jersey in 1934, and upon the expiration of his term in 1938 he was appointed Executive Director of the Unemployment Compensation Commission. After military service from 1942 to 1946 he resumed his office as Executive Director, the title of which was changed in 1950 to Director of Division of Employment Security. On March 18, 1954 he was suspended by executive order of the present Governor of New Jersey, and on June 4, 1954 former Governor Hoffman died.
The proofs establish beyond fair question that during the interval from 1930 until at least 1949, and probably later (since the record shows activity in the General Treasury Fund therein in terms of hundreds of thousands of dollars in deposits as late as 1952), the common denominator in the relationship between the defendant South Amboy Trust Company and the State of New Jersey was Harold G. Hoffman. There is no suggestion that any one other than he, identified with the South Amboy Trust Company, was in a position of influence in the State Government.
The accomplishment of these frauds followed a simple but painstaking pattern, as indicated by the first significant shortage in funds which the State had (or thought it had) on deposit with the South Amboy Trust Company. Incident to an investigation of the status of state accounts with this bank ordered by the Commissioner of Banking and Insurance in June 1954 there were discovered, in a warehouse maintained by the State in Trenton, certain records pertaining to the motor vehicle account which has been mentioned. These included a mass of bank statements apparently regular on their face and purportedly emanating from the defendant bank. These documents and the deposition testimony in reference to them display the simple technique of the embezzlements which began to attack these funds very soon after their establishment. A bank statement reproduced in the record by defendant shows a closing balance in the motor vehicle account $60,000 higher than that shown on another bank statement purporting to continue the same balance, i.e., that of December 3, 1931, to a second page. By June *506 1933 the shortage had risen to $120,000. A bank statement purportedly issued by the South Amboy Trust Company (and reconciled by the appropriate employee of the Motor Vehicle Division in charge of the cash control books of such account, who testified to his handwritten notations thereon in his deposition taken herein) shows a closing balance in this account on June 30, 1933 of $862,764.68, whereas a bank statement in similar form on an identical South Amboy Trust Company bank statement form (but which the same witness had never seen, initialed nor used to reconcile balances) showed a balance for the same date of $742,764.68, or a difference of $120,000. It was, manifestly, by this simple device of substituting for statements issued by defendant false statements in identical form, except for figures, and the reconciling of the figures on the substituted statements with the cash ledger of the state agency, that these defalcations were covered and continued. A statement authentic in the sense that it was reconciled with the state cash ledger and initialed by the witness authorized to do so, showed a balance in this account of $956,194.01 on September 31 (sic), 1933. (The erroneous date of September 31, carelessly affixed by the perpetrator of these frauds, or his accomplice, apparently escaped the attention of the Motor Vehicle employee, who in his deposition points to his own handwritten symbol reconciling this higher (and fictitious) balance with the cash ledger record for which he was responsible.) Another statement, authentic in the sense that it purported to represent the actual balance for September 30, 1933 (but which never had been seen by such witness and was presumably diverted from his attention) shows a balance for the same date of $826,194.01, the discrepancy and shortage amounting to $130,000. Comparison of other groups of statements shows that these frauds extended to falsification of amounts of deposits as, for instance, on a statement for the month of March 1934, on which there was entered a deposit on March 10, 1934 of $26,700, whereas such deposit was shown on the same date in a parallel statement at $16,700.
*507 The proofs establish that these shortages increased eventually to the sum of $300,000 and that their effect infiltrated other accounts of plaintiff in defendant bank. The records of the State indicate that the motor vehicle account was closed, in balance, in 1939 and it is evident that the shortages therein were covered by the use of other accounts in defendant bank. As an example, the State asserts, and its cash records show, that on July 1, 1945 the sum of $100,000 was transferred from its Grade Crossing Elimination Fund to its General Treasury Fund, both in the defendant bank. The bank asserts that the Grade Crossing Elimination Fund was in fact closed by withdrawal of the balance of $100,000 on October 30, 1943. The State asserts that no draft was used by it to transfer this money on July 1, 1945 in these intra-bank accounts, but it produces no supporting data such as a copy of an authorization for such transfer. Similarly, the bank relies on a copy of its ledger sheet to show the final transaction in this account, and the affidavit of an officer that such an intra-bank transfer would nevertheless have affected the record of daily cash transactions in the bank and hence, since not reflected therein, presumably did not occur. One would suppose that under modern banking methods, which are almost judicially noticeable, somewhat better evidence tracing this money could be produced, but unless I have overlooked it in the mass of documentary evidence before me I see no further supporting evidence as to the version of either litigant on this point.
Again, the State contends that on July 1, 1945 there was a balance in its account known as the State Fund in the defendant bank of $200,000 and that the name of such fund was changed on that date to the General Treasury account, and that to accomplish such "transfer" no draft was necessary. The bank's answer to this is that it has no record of such a transfer and that in fact the State Fund account was closed out on May 3, 1941. It produces a copy of its ledger sheet for this account (which would be a duplicate or copy of a bank statement ordinarily furnished a depositor) showing that on May 3, 1941 there existed a *508 balance of $175,000 in this account which was withdrawn by check by the State on that date and which was the final transaction in the account. One would suppose, again, that intensive discovery would uncover more information concerning these opposing versions, but the State furnishes no evidence except its internal cash ledger records of such transfer, for instance, no copy of correspondence transmitting an authority or direction for such transfer or change of name of such account, and again, the record is so deficient that the court is unable to reach a factual conclusion as to such opposing contentions. By way of illustration, it is noted that the Grade Crossing Elimination Fund was an interest-bearing deposit and that the last credit of interest occurred on October 29, 1943, and the State, despite its insistence that this account existed until July 1, 1945, does not explain its failure to protest the discontinuance of such interest thereon.
It is starkly certain, however, in view of the auditing and control requirements placed by statute upon the officers of the State, as well as normal banking practices which are judicially noticeable by the court, that there must have been continuous interception and diversion of the bank statements to its depositor which would have disclosed what the bank now alleges was the true condition of such accounts. Further, there is no vestige of doubt that the shortages existed, but whether they originated internally in the bank or were perpetrated otherwise, the factual record, because of its paucity and confusion, fails to establish. The further manipulation of the accounts, by diverting funds deposited in one account to another, as alleged in the complaint, is unnecessary of analysis or discussion here in view of the issues which can be dealt with on this summary motion at this stage of the proofs. It is sufficient to note that the record establishes and the parties agree that on December 21, 1949 the records of each were in disagreement and that the shortage referred to then existed.
It was in this posture of affairs that the former State Treasurer, Mr. Walter T. Margetts, Jr., handed to Harold *509 G. Hoffman the Disability Benefits Fund warrant of $300,000 which has been mentioned. Additionally, Mr. Margetts had issued another warrant, dated December 14, 1949, to transfer to defendant from the First Mechanics National Bank of Trenton, New Jersey, $100,000 on deposit there in a General Treasury Account. The endorsement read: "Transfer of State Funds, For Deposit only Walter T. Margetts, Jr., State Treasurer." This draft also came into the possession of Hoffman, although he had no official connection therewith, who (on an official letterhead which apparently had survived his term as Governor, as distinguished from official stationery pertaining to his then office as Director of the Commission) transmitted both of such warrants to George A. Kress, then treasurer of the defendant bank. Mr. Kress is now deceased. Since the defendant relies upon this letter in defense of its conduct regarding the Disability Benefits Fund warrant, it is reproduced in full:
 "(State Seal)
 Harold G. Hoffman
 State House
 Trenton, New Jersey
 Dec. 22, 1949
 Geo. A. Kress, Treasurer
 South Amboy Trust Company,
 South Amboy, N.J.
Dear George:
State Treasurer Margetts has handed me the enclosed checks, totalling $400,000, to be deposited as follows:

 $200,000 A/C State of New Jersey
 Walter T. Margetts, Jr., State Treasurer
 General Treasury Account
 This is a time account, interest to be
 paid at 1% per annum.
 Check in payment of interest to be
 forwarded on following dates. Jan. 31,
 April 30, July 31, and Oct. 31
 It is understood that this deposit
 cannot be withdrawn without 30 days
 notice in writing.

*510
 $200,000 A/C State of New Jersey
 Walter H. Margetts, Jr. State Treasurer
 General Treasury Account
 This is a demand account, no interest.
 Some of this may be withdrawn after
 first of year, but will be replaced.

The State General Treasury deposits now have to be secured and Margetts sent me a note saying `Have your bank communicate with your New Jersey or New York Correspondent Bank in regard to securities for $400,000.'
I would suggest buying U.S. Governments in this amount. I think they are yielding about 2 1/2%. The New York Bank will hold them until the funds are withdrawn. It should be profitable for the S.A.T. Co.
 Sincerely,
 (Signed) Harold ________"
Significantly, the text of this letter obscured the identity of the Disability Benefits Fund warrant in its failure to describe the warrants except as "* * * the enclosed checks, totalling $400,000 * * *." In effect the letter directed, and must have been understood by its recipient as directing, the diversion of the proceeds of the Disability Benefits Fund warrant into general state funds, specifically into a General Treasury account. The record indicates that these instructions were followed, as the defendant reproduces its ledger sheet showing the establishment (for the first time) of a time General Treasury account by a deposit of such $200,000 on December 23, 1949. (This was the "General Treasury account" which the State supposed had been established on July 1, 1945, by the transfer into it of $300,000 from other accounts, as hereinabove mentioned.) This exhibit also notes an interim withdrawal of $100,000 of such amount, and later deposits of $600,000 resulting in a present balance of $700,000, which the bank contends is the only account extant and the only money of the State on deposit with it. The remainder of this transmittal of December 22, 1949 took this course:  $200,000 was deposited in the demand General Treasury account (also a new account) and the balance remaining in this account was withdrawn by the *511 State on July 8, 1954. It is an inescapable conclusion from the proofs that the purpose and effect of this diversion of the Disability Benefits Fund proceeds into the General Treasury accounts of plaintiff was to cover existing shortages therein and to forestall the day of discovery and retribution. To accomplish this, however, it was necessary to create a false record that there was in fact on deposit in the defendant bank a disability benefits fund account of $300,000.
This was done by the use of the same simple technique which characterized these frauds from the beginning. A false deposit slip was fabricated dated December 21, 1949 and reciting "For deposit in the account of State of New Jersey, State Disability Fund B,  $300,000." Countervailing deposit slips (referring to the identical proceeds of the drafts transmitted in the Hoffman letter of December 22, 1949) were also issued to verify the deposit of $200,000 each in the demand and time General Treasury accounts above referred to. A passbook came into existence, bearing the notation of a deposit of $300,000 on December 23, 1949 "to the account of the State of New Jersey, Disability Benefit Fund B." A certification of December 31, 1949 to the Department of the Treasury showed a credit to the State in its Disability Benefit Fund B account of $300,000, purportedly signed by George A. Kress as treasurer of defendant. A countervailing December 31, 1949 certification of $400,000 credit in the General Treasury account was issued, also purportedly signed by Mr. Kress. Thereafter, at quarterly intervals, at least to March 31, 1952, there was certified to the State over the purported signature of Mr. Kress the false statement that $300,000 remained to its credit in the defendant bank in the "New Jersey State Disability Fund B." The present treasurer of defendant bank deposes, however, that although he is reasonably familiar with the handwriting of Mr. Kress (and so he should be for this witness first came to work for the bank in 1931 and Mr. Kress was his superior for many years), he believed that the signatures on the certifications were not in the handwriting of Mr. Kress. Although this witness was assistant treasurer *512 in 1949, he professed to have no idea of the identity of the bank employee or officer who certified the status of the State's accounts to it. Again, this witness failed to recognize the handwriting on the fictitious passbook of the Disability Benefits Fund account. Admitting that it was the practice for a teller or recipient to initial such a passbook notation of deposit, conceding that the initial "T" there reflected was compatible with this practice, recalling that a "Mr. T ----," who died in 1953, was the only teller whose name began with the initial "T," the witness was nevertheless unable to recognize this handwriting. Later in his testimony, he said that "Mr. T ----" was an assistant treasurer in 1949, but was ill part of the time.
And there the inquiry respecting these false documents apparently ended, despite the fact that if an officer of this bank had made these false certifications, and particularly if an executive officer had been the corporation's "executing mind" with reference to the perpetration of such fraud (cf. Hirsch v. Phily, 4 N.J. 408 (1950); State v. Pincus, 41 N.J. Super. 454 (App. Div. 1956)), a very tangible legal picture would emerge which quite possibly might end the whole of this litigation at the present stage. As an example, it would be of interest and legal significance if the certification of December 31, 1949 of $400,000 to the State's credit in its General Treasury accounts bore the authentic signature of Mr. Kress, which would seem quite possible because defendant contends that this certification reflected the true status of such accounts at that time. It is, of course, quite practical to compare questioned handwriting with known standards, and to establish or disprove authenticity thereof by the testimony of expert witnesses.
Similarly, the discovery and motion proofs leave a most hazy picture of the extent to which the directing genius in these deposits, Mr. Hoffman, was or was not vested by defendant with authority to supervise its relations with the State, including the duty of certifying to the State at specified intervals the balances remaining to its account. The record discloses no reference to the minute books of the *513 meetings of the board of directors which Hoffman, say some of the witnesses, usually attended, and which might be expected to disclose something concerning the extent to which he represented the bank in dealing with the State. This, again, would be of obvious legal significance to the gravamen of the whole action.
There are other significant gaps in the factual record, such as the availability to the author of these frauds of apparently authentic South Amboy Trust Company statement forms, deposit slips and passbooks. This paper had an important role in the false documentation by which the mechanical pattern of the embezzlements was engineered, and obviously must either have emanated from the bank or been prepared covertly by a printer. Again, how could there have occurred, month after month for 25 years, a successful interception of the bank statements presumably sent by this bank to its depositor, the State Treasurer? Were such statements ever sent, or did the fraudulent substitutions occur internally in the bank itself? And if the bank was innocent, and if its records always reflected what it now projects as the true condition of such accounts, is it within the realm of possibility that no representative of the State, in all the years that these shortages thus lay bare upon its records, visited the bank to examine such accounts? The silence of the factual record on these and other questions of importance is such as to contra-indicate the granting by the court, at this stage, of the extraordinary relief of summary disposal of that part of the issue to which they are so crucially relevant.
Moreover, the accomplishment of these defalcations is the more unnerving to contemplate when one considers the intended safeguards provided by the statutes, all of which, apparently, failed to prevent them. The statutory responsibility of the State Treasurer, as custodian of these funds, is clear, in that he must receive and disburse the moneys of the State, and keep accounts of the receipts and expenditures thereof, R.S. 52:18-11, supra; and state his accounts distinctly in books for the information of the Legislature, R.S. *514 52:18-13; which accounts are to be examined at the end of the fiscal year by a joint committee of the Legislature, R.S. 52:18-15; and upon the accomplishment of such audit, must submit a comprehensive balance sheet, R.S. 52:18-16; shall keep on deposit the moneys of the State, R.S. 52:18-17, 18, supra; and keep, balance, settle and exhibit bank books showing the condition of such deposits, R.S. 52:18-19. Quarterly, he must prepare a true and complete record showing the balance of state funds on deposit with each bank, R.S. 52:18-21, supra. And these duties are not new, but derived from statutes in effect long before the embezzlements in question. It is sobering to realize the apparent fact that each and every one of these statutory accountings from 1931 to 1954 reflected the false and inaccurate balances above referred to.
And there are other statutory responsibilities, the due fulfillment of which might, at first glance, have been expected to have made these frauds more short-lived. It is by law, R.S. 52:24-4 et seq., the duty of the State Auditor
"* * * to conduct post-audits of all transactions and accounts kept by or for all departments, offices and agencies of the State Government, to report to the Legislature or to any committee thereof and to the Governor * * *."
and to
"* * * examine and post-audit all the accounts, reports and statements and make independent verifications of all assets, liabilities, revenues and expenditures of the State, its departments, institutions, boards, commissions, officers, and any and all other State agencies * * *."
and to
"* * * report in writing * * * the findings of any special condition disclosed by his audit * * *."
and to
"* * * report, forthwith, to the governor any and all instances of malfeasance, misfeasance or nonfeasance which may be disclosed by any audit or investigation of said accounts * * *."
*515 And these statutory duties are not new, but were in existence soon after these embezzlements commenced. L. 1933, c. 295, sec. 4, p. 793. Again, superficially, one would expect that their due fulfillment, particularly that of the "independent verification" requirement specified, would have apprehended these shortages very early in the game. Taking all inferences of doubt in favor of the defendant bank, as is the duty of the court here, it must be assumed that the records of the bank plainly showed the lower balances which would have exposed this fraud to the most cursory of examinations. On this postulate, it might seem at the outset that a separate agency of the State, the office of the State Auditor, failed in the duty of "independent verification" imposed upon him by statute.
But evidence now produced by the Attorney-General at the request of the present State Auditor, which was not before the court at the time this motion originally was argued, leads to a different conclusion. It now appears that in accordance with his statutory responsibility the State Auditor, from 1949 and until the exposure of these defalcations, had indeed properly called upon the bank for a certification of the status of the accounts of the State therein. He had received, at proper intervals until the death of Governor Hoffman, verifications of the existence there of a "State of N.J. Disability Benefit Fund `B'," in the amount of $300,000, with other balances consistent with the State's present claims. But all of these verifications were false. They appeared over the purported signature of George A. Kress, treasurer of the bank, and it is stipulated by the parties that before his death in 1954, Mr. Kress had deposed in the investigation of this case by the Attorney-General that he had never signed any certifications or verifications of the nature involved and upon being shown purported signatures on other false certifications which had reached the State Treasurer he denied that such signatures were his. On their face these signatures appear to the court to be the same as those on the verifications made to the State Auditor. Consequently, while it would appear probable that *516 all purported signatures of Mr. Kress were not authentic but were forged, the court can make no specific finding on this question because his sworn statement is not in evidence here. But whether the signatures were authentic or were forged, the verifications themselves were false and it was not until the annual certification of July 6, 1954 that a true certification to the State Auditor was made over the authentic signature of another bank officer. This true certification disaffirmed the existence at the bank of the State Disability Benefits Fund B account. This verification, it will be noted, was received, significantly, shortly after the death of Governor Hoffman. These facts establish that the certifications received on the demand of the State Auditor were corrupted by the same falsification hereinbefore referred to, but beyond that, their existence acquits the State Auditor of default in any sense in the performance of his duty, since they obviously amounted to the "independent verifications" which the law called upon him to make. That they were not effective verifications implies no fault on the part of the State Auditor, for no authority is perceived in the statute permitting him to demand a visual inspection of a bank's records, or such other investigation which would make impossible of reoccurrence the unhappy series of events described herein. This eventuality betokens an unfortunate gap in the statutory safeguard of "independent verification" which can be repaired quite simply by legislative action spelling out the term "independent verification" as including, in this instance, a visual examination of the actual records of the bank.
The collapse of these protective instrumentalities of the State, which permitted the perpetration of such frauds and their concealment for so many years, is of legal consequence here, emphasizing as it does the legal impossibility of a summary unravelling of the whole creditor-debtor relationship of the bank and its depositor. This is particularly true because of the conflict between the internal cash records of the State and those of the defendant bank, which are of equal dignity and probative weight in the setting disclosed, *517 which would, in the face of these other circumstances, prevent such arbitrary factual finding. But beyond this, the issue is one of surpassing moral import and of consequence to the public welfare, for it is self-evident that the source and key of the apparent impotence of the State in protecting its funds was the dual agency of said Hoffman. As indicated, he was at once a principal and influential officer of the bank and an occupant of the highest offices (including that of Governor and at other times of other offices) in the State Government, which permitted him to wield an obvious influence in the State's fiscal relationship with what State Treasurer Margetts referred to, in his letter to Hoffman, as "your bank." While this reference justifies no reflection upon such State Treasurer, and was obviously innocuous in intent, it aptly demonstrates the double interest of Hoffman in the circumstances, and this conflict of interest explains what otherwise would be incredible.
True conflict of interest is as much a matter of public discussion today as it was compatible with the mores of the recent past. But whether it is tolerated by a complacent public or denounced by an outraged victim, it is and always has been wrong in the moral sense. For centuries, the precedents of the law have condemned the enrichment of a trustee in dealing with himself with the assets of his trust. And disaster is invited by the public when it permits the public trust to be corrupted by a conflict of interests incompatible with the carrying out of its true trust purposes. With no wish to pontificate on this moral issue, the court would be doing less than its duty were it to maintain a discreet but hypocritical silence as to the real and basic vice discerned by its findings in the present case. These proofs establish beyond doubt, whatever the mechanics which powered these frauds or the subterfuges which concealed them, that their basis, origin and accomplishment alike resided in the dual agency of Hoffman as an executive officer of the bank and as an influential officer of the State which was its depositor.
*518 What has been noted as to the deficiency of the factual record is not to be understood as critical of either litigant, but merely to demonstrate the paucity and comparative disorganization thereof, which prevents summary disposition at this stage of the general creditor-debtor relationship of the parties embracing the whole of the deposits, as reflected in the State's claim for summary judgment on count 2 of its complaint. The law in the matter has been briefed excellently by both sides, but it is the factual record which seems to me so deficient as not to justify summary judgment on that count at this time. The sense of that cause of action seeks the declaration by the court that the State presently has on deposit with the defendant bank the sum of $1,000,000, as opposed to the defense insistence that it has there only $700,000. The ramifications of the shortages (which I have taken some time to describe for purpose of demonstration), their instigation, the detail of their physical perpetration, their chronology and locale, their involvement in the whole relationship between the State and the bank, the participation of one or more culprits in their consummation  all of these factors need illumination before the court justly may be asked to declare summarily that the defendant has on deposit $1,000,000 of the money of the State. The record here certainly does not exclude the possibility that portions of the funds which the State claims were deposited never actually came into the possession of such bank and that, accordingly, the creditor-debtor relationship as to them never came to exist as a legal status. The effect of this eventuality would be to revert the State to its claim for redress in the third count of its complaint involving alleged tortious elements of collusion and causative fault which are not made, and could not well be made, the subject of the present motion for summary judgment.
But a clearly different legal situation prevails as to the first count of the complaint. That cause of action grounds upon the diversion by the defendant of the proceeds of the disability benefits fund warrant of $300,000 into other accounts and impliedly characterizes this misdeposit *519 as a tortious conversion and a breach of contractual obligation as well, entitling the State to recover the $300,000 of disability benefits funds, transferred to it by the warrant of December 21, 1949. The right to summary disposition of this count of the complaint is not burdened with the grave questions of fact and law which inhibit the court's determination of the whole creditor-debtor relationship referred to. On the contrary, the proofs in any aspect, with all inferences of fact and doubt considered in favor of the defendant, project this naked reality:  that on and after December 21, 1949, and for long before, there was a shortage of $300,000 in the accounts which the State believed it had (and which its records showed it had) on deposit in the defendant bank. In that situation, it transferred for deposit $300,000 of disability benefits funds on an instrument plainly setting forth on its face the nature of the funds represented, and that their transfer was for deposit. A statute, R.S. 43:21-46, supra, plainly classified these moneys as trust funds in the hands of the State Treasurer for certain purposes, not including their diversion, custody or intermingling with general funds of the State. The transmittal letter of Hoffman directed that these funds be deposited otherwise than for the trust purpose and it is upon this letter that the bank relies in justifying its failure to deposit such funds as disability benefits funds.
On this phase of the case, I find in fact and conclude in law that the transfer of the disability benefits funds for deposit was a trust deposit in nature, and that its diversion into general state accounts was a conversion in law and a breach of the contractual obligation of the bank to its depositor; that the trust nature of the deposit was as clear and binding upon the bank as though the text of the statute had appeared upon the face of the warrant in addition to the legend setting forth the nature of the funds thereby represented; that the letter of authority from Hoffman constituted no more justification for the diversion of this trust fund than it would have had had he directed it into his personal account, in view of the obvious nature of the *520 misdeposit directed and the bank's notice of and participation in his long-standing dual agency; that the bank, knowingly receiving funds from a public official under circumstances contrary to the statute, was chargeable with notice of the violation and was put upon inquiry to ascertain the truth; that the suggestion that the direction of the funds into general state accounts might have constituted a refund of overpayments by the State of contributions for its employees (one of the trust purposes of the fund according to the statute) is, under the circumstances, specious, frivolous and entirely unsupported by the proofs or inferences arising therefrom; that in view of the relationship of dual agency on the part of Hoffman, and the other circumstances here present the Uniform Fiduciaries Act, N.J.S. 3A:41-1 et seq., is in no way applicable to the relationship between the bank and Hoffman generally and to the instant transaction in particular; that in view of the trust purposes referred to, the true relationship between the State and the bank in relation to the trust deposit involved constituted a bailor-bailee relationship in the sense of a trust deposit, and a misdeposit or misapplication thereof constituted a conversion of the proceeds of such warrant; and that no estoppel, waiver or laches defense against the State is valid in view of the totality of the circumstances in general, and the dual agency of Hoffman in particular.
It is, therefore, determined that the State is entitled to the entry of judgment against the defendant bank for $300,000 on these terms  that such money judgment constitutes $300,000 in the disability benefits funds created by the statute cited and on the theory that the character and identity of such funds, in law, remained unchanged despite their physical misdeposit and diversion into general State funds. It is the further sense of such judgment that it is without prejudice to the right of the defendant to assert that apart from such funds it holds but $400,000 on deposit for the State and, of course, without prejudice to the State to support by further proofs its contention that apart from such funds the bank holds $700,000 on deposit for it. It is *521 the sense of the rules and the precedents (R.R. 4:58-4, 5, 6, 7; Templeton v. Glen Rock, 11 N.J. Super. 1 (App. Div. 1950); Judson v. Peoples Bank & Trust Co. of Westfield, supra; Monmouth Lumber Co. v. Indemnity Insurance Co. of North America, supra; Robbins v. Jersey City, supra) that finality of decision as to summary judgment may be withheld pending the marshalling of further proofs. For this purpose, the court denies the State's motion for summary judgment on count 2 without prejudice to the renewal thereof at a later stage of the proceeding. Leave is granted the parties to amend the pleadings to embrace the issues left undetermined by the court's summary judgment as to count 1, as hereinbefore limited, such amendments to be completed within 45 days after the termination of further discovery proceedings; these amended pleadings may, in the discretion of counsel, be moulded to reflect cross-claims for declaratory judgment; the period for the taking of discovery proofs is opened, same to be completed within 120 days hereof; the pretrial conference with reference to counts 2 and 3 of the complaint is hereby opened and further pretrial conference after joinder of issue on any amended pleadings is to be had.
An order for judgment on the above terms should be presented, on notice or on consent as to form.