CATHERINE O'NEILL, INDIVIDUALLY AND AS EXECU-
TRIX AND TRUSTEE UNDER THE WILL OF JOHN I.
O'NEILL, DECEASED, PLAINTIFF-RESPONDENT AND
CROSS-APPELLANT, v. STATE HIGHWAY DEPARTMENT
OF NEW JERSEY AND DWIGHT R. G. PALMER, COM-
MISSIONER OF THE STATE HIGHWAY DEPARTMENT
OF NEW JERSEY, DEFENDANTS-APPELLANTS AND
CROSS-RESPONDENTS.

CATHERINE O'NEILL, INDIVIDUALLY AND AS EXECU-
TRIX AND TRUSTEE UNDER THE WILL OF JOHN I.
O'NEILL, DECEASED, THIRD-PARTY PLAINTIFF-AP-
PELLANT, v. LAWYERS TITLE INSURANCE CORPORA-
TION, A VIRGINIA CORPORATION AUTHORIZED TO
DO BUSINESS IN NEW JERSEY, THIRD-PARTY DE-
FENDANT-RESPONDENT.

Argued November 23, 1965—Reargued February 20 and 21, 1967—
Decided November 6, 1967.

310

312

*Mr. John C. Heavey, Jr.,* argued the cause for plaintiff–respondent and cross-appellant and third-party-plaintiff-appellant, Catherine O'Neill (*Messrs. Carpenter, Bennelt and Morrissey,* attorneys).

*Mr. Alfred A. Porro, Jr.,* argued the cause for New Jersey Meadowland Institute, Inc. and Inter-County Title Guaranty & Mortgage Co., *amici curiae* (*Messrs. Porro, Sirotta, Robinson, Campo and Hollenbeck,* attorneys).

*Mr. James A. Major* argued the cause for Reinauer Land Company, *amicus curiae* (*Messrs. Major and Major,* attorneys).

*Mr. James L. R. Lafferty* argued the cause for New Jersey Title Insurance Association, *amicus curiae* (*Messrs. Steelman, Lafferty, Rowe and McMahon,* attorneys).

*Mr. Michael I. Sovern,* of the New York bar, argued the cause for The Commission to Study Meadowland Development, *amicus curiae* (*Messrs. Meyner and Wiley,* attorneys).

*Mr. Alan B. Handler,* First Assistant Attorney General, and *Mr. David A. Biederman,* Deputy Attorney General,

argued the cause for defendants-appellants and cross-respondents (*Messrs. Avrom J. Gold* and *Michael C. Rudolph,* Deputy Attorneys General, on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This case involves the ownership of lands along the Hackensack River in East Rutherford claimed by the State to be "tidelands" and as such to be its property. The trial court, sitting without a jury, found the property was tideland, but held the State was estopped to assert its title because of certain transactions between the defendant State Highway Department and plaintiff to which we will later refer. Involved also was a claim by plaintiff upon a title policy issued by defendant title insurance company. The title company answered that "tidelands" were excepted from the policy coverage and on that basis it declined to defend plaintiff against the claim of ownership urged by the State defensively. As to this phase of the case, the trial court, having found that the lands were tidelands, gave judgment for the title company. Both plaintiff and the Highway Department appealed, and we certified the case before argument in the Appellate Division.

I

The complaint had two counts. The first, which sought a judgment of ejectment, was dismissed on defendant's motion before trial on the ground that the State had not consented to be sued. The trial proceeded on the second count which sought to compel the Highway Department to condemn lands it used for highway purposes. The lands so used were but a small part of the total parcel of 25 acres which both plaintiff and the State claim to own. Although but a small part of the premises was thus actually involved, the testimony ranged indiscriminately over the entire tract. So also, although the judgment ultimately ordered the Highway

Department to condemn only the strip actually used in the highway project, it nonetheless adjudged ownership of the whole tract.

The Highway Department raised no objection either at trial or on appeal to the litigation of title to the entire tract. We raised the question, and in response the Attorney General said he was satisfied to have that larger issue decided in these proceedings, and this notwithstanding that at an earlier stage the Highway Department successfully resisted the ejectment count upon the ground of sovereign immunity. The Attorney General's offer to submit the matter to the judiciary suggests the question, which was not argued, whether he has the power to consent on behalf of the State to an action proscribed by the doctrine of sovereign immunity. See 7 *Am. Jur. 2d, Attorney General*, § 15, *p.* 20; annotation, 42 *A. L. R.* 1464, 1484 (1926). We will not, however, pursue that inquiry because we are satisfied an action by the owner of upland to settle a tideland controversy is outside the immunity doctrine.

We need not recount the uneven history of sovereign immunity. Suffice it to say that today courts are disposed to hear an action against the State unless good reason stands in the way. It is currently said the doctrine bars suits which seek to control State action or to subject it to liability. *Duke Power Co. v. Patten*, 20 *N. J.* 42, 50 (1955); *Gallena v. Scott*, 11 *N. J.* 231, 237 (1953); *Abelson's, Inc. v. New Jersey State Board of Optometrists*, 5 *N. J.* 412, 417 (1950). Thus a suit will be declined if it requires an order of a court upon the Legislature or the Governor, or if it seeks directly to control the exercise of discretion vested within the other branches of government and this for the reason that the Constitution intends that discretion to be beyond judicial interference of that kind. So, too, an action for a money judgment against the State is barred because the judiciary cannot compel its co-equal branches of government to appropriate moneys to pay. See *Fitzgerald v. Palmer*, 47 *N. J.*

106, 108 (1966) ; *City of East Orange v. Palmer,* 47 N. J. 307, 328–329 (1966).[1]

A suit to settle title to property does not collide with considerations upon which the State's immunity from suit now rests. The private claimant does not ask the judiciary to compel the Legislature or the Chief Executive to do anything. Nor does the claimant seek a dollar judgment. He asks only that it be decided that he, and not the State, is the owner of some specific property. *Cf. Michalski v. United States,* 49 N. J. Super. 104, 110 (*Ch. Div.* 1958). That issue must be decided sometime, for we must assume the State will persist in its claim and will, sooner or later, exercise a right of ownership sufficient to permit a suit against it under the cases we have just cited. Since vast areas of valuable land are now idled by the tidelands controversy, and still other property, already improved, lies in its shadow, there is an economic blight which should be dissipated in the public interest. We think it our duty to accept the litigation.

For reasons stated hereinafter, the matter must be remanded for retrial. Upon the remand plaintiff may amend her complaint to add the State of New Jersey and to demand a declaration of ownership as to the entire tract, in addition to her existing demand that the State Highway Department be ordered to condemn the portion already used for highway purposes.

---

[1] But even with respect to matters which otherwise would be within this doctrine of immunity, an action will lie against an appropriate State officer or agency if it rests upon a statutory right or duty. Thus, if the Highway Department takes lands, it may be ordered to condemn them on the thesis that a statute obligates it to do so. *Haycock v. Jannarone,* 99 N. J. L. 183 (*E. & A.* 1923) ; cf. *Empire Trust Co. v. Board of Commerce and Navigation,* 124 N. J. L. 406 (*Sup. Ct.* 1940), and *Hall v. Alampi,* 47 N. J. 60 (1966). Again, the courts will adjudge monetary claims founded upon statute, because the Legislature has inferentially indicated an intent to provide the sums needed to make good the statutory scheme. See, *City of East Orange v. Palmer, supra,* 47 N. J. at 329; *Amantia v. Cantwell,* 89 N. J. Super. 7, 12–13 (*App. Div.* 1965).

## II

As stated earlier, the trial court found the State owned the tract but was estopped to say so.

The facts with respect to the issue of estoppel are these: In 1931 and 1932 the State Highway Department condemned some portions of the tract and paid compensation. In 1953 John I. O'Neill took title from the record upland owner. On June 1, 1954 he entered into a contract with the Highway Department to convey a small portion for $3,422. The title examination, however, revealed that O'Neill owned but a ⅝ interest in the tract, and presumably he was so advised. O'Neill died on October 7, 1955, and his widow, the plaintiff, became executrix of the estate. On January 13, 1959, four and a half years after the contract was made, counsel for Mrs. O'Neill inquired of the Highway Department as to what disposition had been made of it. The Department replied on February 5, 1959 that the agreement had not been consummated because of the title deficiency we just mentioned, and said that although normally a condemnation proceeding would have been started because of the title problem, none was because a question had intervened with respect to the location of a proposed interstate route. The letter added that "We feel at the moment that we will continue to withhold any action in light of future developments from the standpoint of additional or new construction." Although the record is obscure, it seems safe to assume that O'Neill was advised of the Department's position prior to his death in October 1955.

In December 1957, long before her inquiry of the Highway Department concerning the status of the 1954 contract, Mrs. O'Neill paid $21,660.96 to satisfy liens for municipal taxes on the tract. Between that date and July 1961 when the present dispute arose, she paid taxes in the further sum of $1,901.87. In addition, following receipt of the Department's letter of February 5, 1959, mentioned above, in which reference was made to the title deficiency, Mrs. O'Neill

started a quiet title suit in connection with which she expended $5,550. After obtaining judgment, Mrs. O'Neill so advised the Highway Department, and in early 1960 she delivered a deed and received the contract price of $3,422.

Plaintiff stresses the expenditures just recounted to support her claim of estoppel. But there is nothing to show they were made at the request of the Department. As to the taxes, it is clear that Mrs. O'Neill paid them in order to avoid a tax foreclosure. The decision to sue to quiet title appears to have been wholly her own. As already noted, the Department would have condemned when ready, leaving the claimants to quarrel over the proceeds. The record shows only that after she started the suit to quiet title, Mrs. O'Neill informed the Department to that effect in connection with a request for some information to assist her. The fair inference is that she decided upon the suit, not to fulfill an obligation to the Department under the 1954 contract for which she would receive $3,422, but rather to further her claim to the whole tract.

No officer of the State, conscious of the State's interest and aware of the O'Neills' misapprehension, stood by while the O'Neills spent their money. The agency at the scene, the Highway Department, was not the State's representative in tideland matters; the power to sell and to lease reposed elsewhere. *N. J. S. A.* 13:1B–13; *Bailey v. Driscoll*, 19 *N. J.* 363, 367, 375 (1955). Nor did the Highway Department represent to the O'Neills that they owned the property. Rather it was the O'Neills and their predecessors who so claimed and thereby so represented to the Highway Department. The most that can be said is that the Highway Department, erroneously assuming with the claimants that the property was not the State's, paid moneys the recipients should not have received. Surely it cannot be found that the O'Neills would have abandoned their claim to the tract and walked away if the Department had asserted the State's claim of title.

The question is not whether the Highway Department would be estopped if it sought to recover the moneys it paid on the assumption that the property was privately owned. Rather plaintiff seeks to obtain title to a tract of land which, for the purposes of the estoppel issue, must be assumed to be the State's. Her claim is factually lacking, not only in respects we have already noted, but further in that she has not demonstrated the consequence of an estoppel ought to be the transfer to her of the State's title to 25 acres of land. Specifically, there is no proof the expenditures equalled or exceeded the value of the property. On the oral argument counsel for Mrs. O'Neill, in response to an inquiry from the Court, said the lands were believed to be worth some $200,000 above the out-of-pocket sums mentioned above. Estoppel is designed to do equity. It would plainly be inequitable to deprive the true owner of property having a value in excess of the loss attributable to conduct upon which estoppel is sought to be grounded.

For these reasons, we are satisfied that a claim to ownership by estoppel must fail, wholly apart from the circumstance that it is the State against whom the claim is made. Our discussion could end here, but since the parties have fully argued the question whether estoppel may bar the State and it is certain to arise in future litigation, we will deal further with it, and as well with other concepts applicable between private disputants which rest upon inactivity and the passage of time.

It is said in general terms that neither estoppel nor laches is applied against the State to the same extent as against private parties. *Abbott v. Beth Israel Cemetery Ass'n of Woodbridge,* 13 *N. J.* 528, 548 (1953) ; *Schultz v. Wilson,* 44 *N. J. Super.* 591, 605 (*App. Div.* 1957), certification denied 24 *N. J.* 546 (1957) ; *State v. Erie Railroad Co.,* 23 *N. J. Misc.* 203, 214 (*Sup. Ct.* 1945) ; 28 *Am. Jur. 2d, Estoppel and Waiver,* § 123, *p.* 783; annotation, 1 *A. L. R. 2d* 338, 344 (1948). The topic may arise in settings so diverse that it can sensibly be considered only in a spe-

cific context. The question is not whether, for example, the State should be estopped in a penal prosecution from disputing a license it issued in error. The subject is the State's property. And the question is not even whether the State should be estopped to dispute a deed or lease made by the agency authorized to act for it in that regard. See *Daniell v. Sherill*, 48 *So. 2d* 736, 23 *A. L. R. 2d* 1410 (*Fla. Sup. Ct.* 1950); *Strand v. State*, 16 *Wash. 2d* 107, 132 *P. 2d* 1011 (*Sup. Ct.* 1943). That question may well await a factual setting requiring an answer. Here the only agency which acted, the Highway Department, neither represented the State as to its tideland property nor purported to do so. The issue, then, is whether the State's failure to exercise dominion over its properties or somehow to give public notice of its many holdings, should operate to divest it of title in favor of someone who in good faith dealt with the property in the belief that it was privately owned.

It would grossly disserve the public interest to hold that the State's continued ownership shall depend upon such measures. As a matter of good housekeeping, the appropriate officers of the State should do what is feasible to catalogue the State's far-flung holdings, but we cannot be indifferent to the difficulties involved, especially in ascertaining all the tidelands to which the State has clear or colorable title. It was precisely because of this that we would not read the In Rem Foreclosure Act to mean that the State's title to tidelands could be wiped out in a strict foreclosure of a municipal tax lien which ran against property listed as privately owned. *Transcontinental Gas Pipe Line Corp. v. Department of Conservation and Economic Development*, 43 *N. J.* 135 (1964).

 It is settled that the State's title in tidelands cannot be lost by adverse possession or prescription. *Quinlan v. Borough of Fair Haven*, 102 *N. J. L.* 443, 446 (*E. & A.* 1926); *Jersey City v. Hall*, 79 *N. J. L.* 559 (*E. & A.* 1910); *State v. Maas & Waldstein*, 83 *N. J. Super.* 211, 222 (*App. Div.* 1964); annotation, 55 *A. L. R. 2d* 554, 578, 587

(1957). The same considerations bar an estoppel against the State to assert its title because of delay or inaction. See *Schultz v. Wilson, supra,* 44 *N. J. Super.,* at 605; *United States v. State of California,* 332 *U. S.* 19, 39–40, 67 *S. Ct.* 1658, 1668–1669, 91 *L. Ed.* 1889, 1900 (1947); *Beaver v. United States,* 350 *F. 2d* 4 (9 *Cir.* 1965), certification denied, 383 *U. S.* 937, 86 *S. Ct.* 1067, 15 *L. Ed. 2d* 854 (1966); *Board of Park Commissioners v. Taylor,* 133 *Iowa* 453, 108 *N. W.* 927, 931 (*Sup. Ct.* 1906); *Barbee Mill Co., Inc. v. State,* 43 *Wash. 2d* 353, 261 *P. 2d* 418 (*Sup. Ct.* 1953). So also we cannot accept the proposition advanced by *amicus,* Reinauer Land Company, that we indulge in a presumption of a lost grant. If the proposal is in terms of an inexorable rule of law designed to transfer State property because of a claimant's activities or the State's inaction, it is essentially but a fictional statement of one or more of the doctrines just mentioned which our cases decline to apply against the State; and if the proposal is only in terms of an evidentiary inference, there is nothing to warrant a finding or assumption that the State likely conveyed its title by an instrument which cannot be found.

These conclusions are especially required with respect to tidelands. *N. J. S. A.* 18:10–5 provides:

"All lands belonging to this state now or formerly lying under water are appropriated for the support of public schools. All moneys hereafter received from the sales of such lands shall be paid to and invested by the board of trustees, and shall constitute a part of the permanent school fund of the state."

Our statute has so provided at least since 1894 (*c.* 71, *p.* 123), and the *Constitution of* 1947, *Art.* VIII, § IV, ¶ 2 provides, as did the *Constitution of* 1844, *Art.* IV, § VII, ¶ 6, that property appropriated for the support of free public schools may not be used by the Legislature for any other purpose. It would run against the thesis of the statute appropriating tidelands to the school fund and as well the

thesis of the constitutional provision, to say that the State's title may be lost by mere inaction.

We are mindful that the actual application on the ground of the legal test of tideland ownership, to which we will presently refer, presents some obscure and difficult situations in which private equities, particularly with respect to improvements, may be entitled to protection consistent with the preservation of the State's interests. That is another matter, which may be more intelligently explored in factual settings as they appear.

## III

This brings us to the question whether the trial court erred in finding the lands were owned by the State.

The Highway Department asserts that the State owns tide-flowed lands up to the high-water mark. Plaintiff accepts that rule, and *amicus curiae*, The Commission for Study of Meadowland Development, supports it. The title company and the other *amici curiae* assail that test in terms of historical error and present-day inutility. We are not persuaded to depart from our decisions on either score. It seems to us that the obscurity which attends the ancient writings was resolved long ago in our State. See *Bailey v. Driscoll*, 19 *N. J.* 363 (1955) ; *Schultz v. Wilson*, 44 *N. J. Super.* 591 (*App. Div.* 1957), certification denied, 24 *N. J.* 546 (1957). And with respect to the proposition that some other concepts would be more serviceable, it seems to us that the alternatives which have any arguable support in early literature are no more precise when sought to be applied to the land. Their contribution would be only to reduce the State's tideland holdings. Indeed they are urged to that end. The challenged rule being one of property law upon which countless transactions have been had, we will not overturn it.

An important issue in this case relates to the sufficiency of the proof offered by the litigants. To deal with that issue, it is necessary to state in more detail the rule of property

law in the light of which the sufficiency of proof must be judged.

The State owns in fee simple all lands that are flowed by the tide up to the high-water line or mark. The high-water line or mark is the line formed by the intersection of the tidal plane of mean high tide with the shore. The mean (sometimes called "ordinary") high tide is defined as the medium between the spring and the neap tides. *New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co.,* 44 *N. J. Eq.* 398, 400–401 (*Ch.* 1888), affirmed o. b. 47 *N. J. Eq.* 598 (*E. & A.* 1890) ; *Faulks v. Borough of Allenhurst,* 115 *N. J. L.* 456, 462 (*E. & A.* 1935). Mean high tide was stated in *Borax Consolidated, Ltd. v. City of Los Angeles,* 296 *U. S.* 10, 26, 56 *S. Ct.* 23, 31, 80 *L. Ed.* 9, 20 (1935), to be "a mean of *all* the high tides" (our emphasis). That definition is deemed to be "more exact" in 1 *Shalowitz, Shore and Sea Boundaries* (1962), *p.* 96,[2] and since the Coast and Geodetic Survey of the United States Department of Commerce, the acknowledged authority with respect to mean high tide readings, presumably utilizes *all* the high tides in preparing its data, we accept the definition it believes to be more precise. We subscribe also to the view of *Borax* that the average to be used should be, if possible, the

---

[2] Shalowitz deems the "line of the medium high tide between the springs and the neaps" to be a close approximation of the more exact statement in *Borax,* saying :

"* * * This is so because the spring tides occur with the same frequency as the neap tides and generally, though not always, one is as much above a medium plane as the other is below it, and therefore would cancel each other. There is a practical value in the use of all the high tides (springs, neaps, and intermediates) for the determination of the plane of mean high water instead of only the high waters between springs and neaps. It is a simple matter to tabulate all the high waters for a given period and obtain an exact mean, but if the intermediate high waters only were to be used there would be a possible margin of error in the selection of the spring and neap high waters for exclusion, unless they are determined by harmonic analysis."

average of all the high tides over a period of 18.6 years (296 *U. S.*, at *p.* 26–27, 56 *S. Ct.*, at *p.* 31, 80 *L. Ed.*, at *p.* 20).[3]

 The tidal boundary is then the line of the mean high tide upon the land. If the elevation of the mean high tide is known (here the litigants accept the figure of 2.89 feet over mean sea level at Sandy Hook, as established by gauge readings of the Coast and Geodetic Survey at Secaucus, directly across the river from the property here involved), the tidal boundary may be established by elevations taken on the land. In that event, evidence that land above that elevation is periodically covered by high tide would not suffice to prove it is tideland. This is not to say that all land below that elevation is tideland; the land must in fact be tide-flowed, and hence interior land which is below that elevation and which the mean high tide does not reach naturally is not tideland.

 The State cannot acquire interior land by such artificial works as ditching which enables the tide to ebb and flow on lands otherwise beyond it. And so too the riparian owner cannot, today, enlarge his holdings by excluding the tide. At one time he could, by virtue of "local custom," down to mean low water. This custom was accepted and sanctioned by the "Wharf Act," *L.* 1851, *p.* 335. But the custom was deemed to give only a license revocable by the State, except as to lands already acquired by an exercise of it. *Stevens v. Paterson & Newark R. R. Co.*, 34 *N. J. L.* 532, 546 (*E. & A.* 1870). The Wharf Act was repealed and the local custom terminated as to certain tidal lands by *L.* 1869, *c.* 383, § 3, *p.* 1018, and as to the remaining tidal lands in

----

[3] This accepts the judgment of the United States Coast and Geodetic Survey. In 1 *Shalowitz, Shore and Sea Boundaries* (1962), *p.* 89, *n.* 16, it is explained that

"A period of 19 years is generally reckoned as constituting a full tidal cycle because the more important of the periodic tidal variations due to astronomic causes will have gone through complete cycles, and because the variations of nonperiodic character resulting from meteorological causes may be assumed to balance out during this epoch."

the State by *L.* 1891, *c.* 124, *p.* 216. The repealing statutes expressly stated they shall not be construed to restore any supposed right, usage, custom, or local common law, founded upon the tacit consent of the State or otherwise to fill in any land under water below mean high tide. See *N. J. S. A.* 12:3–4; *Bailey v. Driscoll, supra,* 19 *N. J.,* at *pp.* 369–372. Thus lands below mean high water acquired by a riparian owner pursuant to the local custom prior to the effective date of the repealing statute applicable to them are securely held,[4] while tidelands he artificially appropriated after those dates remained the property of the State.

Although it is difficult to follow the record with its many references to maps, we gather that the available elevation readings on the 25-acre tract show most of it to be more than 2.89 feet above mean sea level at Sandy Hook. If no more appeared, plaintiff's title would be clear to lands of such elevation and to lands interior thereof below that elevation which were not reached by mean high water. The Highway Department contends, however, that the lands were grossly disturbed by artificial means and therefore the elevation readings should be discarded. Specifically, it refers to four man-made alterations:

(1) Blackman's Creek, a tidal stream which flowed north to south directly from the Hackensack River through the center of the tract, was rerouted and the original channel filled in;

(2) a highway was constructed over the westerly portion of the tract;

(3) a 20-foot dirt road for a pipeline company was constructed across the westerly portion of the tract;

(4) garbage fill was placed upon about half of the tract, raising the elevation in some places to over ten feet.

With respect to the highway construction, enormous amounts of dirt fill were brought in, and some quantities disappeared,

---

4 The question whether those lands are lost if the tide is readmitted is beyond the reach of this opinion.

resulting, in the view of the Department's witnesses, in "mud waves" moving laterally and thus raising the elevations beyond the area in which the fill was deposited.

The highway construction and the moving of Blackman's Creek were the State's doing. The record does not reveal whether the pipeline road and the garbage fill were authorized by plaintiff or her predecessors. There was no testimony as to whether test borings could reveal the probable natural elevation of the lands covered by garbage fill. Doubt was expressed at argument with respect to the feasibility of such a study.

The State produced witnesses who testified, on the basis of visual observations in 1929, which was prior to the artificial disturbances mentioned above, that these lands, or portions, were covered by high tide daily over a period of time. Some elevations were taken in connection with the construction of the highway. There were introduced the drainage report of C. C. Vermeule, a recognized topographer, and a map he prepared in 1896 in connection with his proposal for the reclamation and development of the Hackensack and Newark Meadows. The map would indicate the lands in dispute were "tide-marshes," but its implication here (apart from the question of possible subsequent changes in relative mean sea level or by accretions or erosions on the land site) is equivocal since the report described a total area of some 27,000 acres as "tide-marsh, lying at, or slightly above, the level of high tide." Neither Vermeule, nor the witnesses who testified to on-site observations prior to the artificial disturbance of the lands, had a tideland title controversy in mind, and hence there is room to question the precision of their observations for present purposes.

The proofs suggest questions as to (1) the effect of artificial disturbance of the lands upon the burden of persuasion, and (2) the probative value of observations that the land was heretofore submerged at high tide.

As to the first, we think the burden should be upon the party who challenges the existing scene, whether the

alterations were due to State or to private activity, to satisfy the trier of the facts that the tideland status of the property was changed by such artificial measures. Overall it is probable that Government and the citizen heretofore acted in good faith in dealing with these lands. In the past little attention was paid to the status of most of the marsh or meadow land, probably because their then values were relatively low. Some of these lands were assessed for local taxation. Upon some, we are told, valuable improvements have been erected. It would be too much to ask a party who has dealt with the land, whether the party be the State, its grantee or a private claimant, to bear the burden of proving the tideland status of the property in its undisturbed state. Practical necessity requires that the burden of persuasion be placed upon whoever asserts a tideland status different from that which now appears. This is not to say that a party aware of a tideland issue can deliberately improve his position by artificial changes on the land. On the contrary, an appropriate inference may be drawn against him if he does not, prior to such activity, obtain and preserve evidence respecting the tideland status of the property.

On the facts before us, the burden of persuasion with respect to the impact of artificial change rests upon the State as to lands not now covered by mean high tide, and upon plaintiff as to such of the lands as are now in fact below mean high tide.

The remaining question concerns the probative value of lay observations concerning the flow of the tide upon the land. Such proof could not hold its own against unequivocal evidence that undisturbed land is above the mean high tide elevations established by reference to the findings of the Coast and Geodetic Survey, but we are not prepared to reject such evidence when, as here, there is no certain proof as to the status of the property prior to man-made changes. The trier of the facts of course would want to be satisfied that the observations do bear upon the particular property involved. Since the question is whether the high tides ob-

served were tides higher than the mean high tide, the trier of the facts may require, in addition to such lay testimony, the views of an expert upon the question whether observations over the period related by the witnesses, either alone or by correlation with data possessed by the Coast and Geodetic Survey, can reliably establish mean high tide.

We cannot accept the trial court's finding that the tract is tideland. We cannot be sure the trial court approached this issue with the same concept of the burden of persuasion which we have stated. We note that on the record as it now stands, certain portions of the tract are clearly owned by the State and some apparently by plaintiff. For example, the bed of Blackman's Creek and of another natural waterway seem plainly to be the State's. On the other hand, there is testimony that borings taken in an area which lies above the level of mean high tide show the land there is undisturbed, and if the witnesses to that effect are credited, such land is upland. Moreover, as we said earlier, the issue as framed related only to the lands the Highway Department used for highway purposes and thus did not embrace the entire 25-acre tract. The litigants' interests should not be adjudged on a record made in those circumstances.

To summarize, we find no basis for an estoppel against the State and hence the judgment, which rests upon that finding, must be reversed. The cause is remanded for retrial on the issue whether the lands are tidelands, with leave to amend and to add the State if plaintiff wishes a declaration of title as to the entire tract. The controversy between plaintiff and the title company will await a decision on the tideland issue and to that end the judgment in favor of the company is reversed.

The judgments are accordingly reversed and the matters remanded for proceedings not inconsistent herewith.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For affirmance*—None.