133 N.J. Super. 245 (1974)
336 A.2d 46
CITY OF NEWARK ET AL., APPELLANTS,
v.
NATURAL RESOURCE COUNCIL, IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION, ET AL., RESPONDENTS. JOSEPH L. JONY AND ALMA JONY, HIS WIFE, PLAINTIFFS,
v.
STATE OF NEW JERSEY, TOGETHER WITH TWO SUB-DIVISIONS, AGENCIES AND DIVISIONS THEREOF, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANTS. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFFS,
v.
MARTUCK REALTY, DEFENDANTS. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
CARIDDI, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
BOROUGH OF EAST RUTHERFORD, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
LOGOTHETIS, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
F. SYLVESTER, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
FISHER, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
MARINO, DEFENDANT. NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
TOP NOTCH METAL REALTY CO., DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 19, 1974.
*249 Mr. Morton J. Goldfein and Mr. William C. Rindone, Jr., Deputies Attorneys General, for the respondents. (Mr. William F. Hyland, Attorney General).
Mr. John R. Weigel, Special Counsel, for City of Newark, City of Elizabeth, Esther G. Bertoni et al., and New Jersey Land Title Insurance Association.
Mr. Alfred A. Porro, Jr., for Borough of East Rutherford et al., and Joseph L. Jony et al.
Mr. Nicholas Martini, for Marie Mazza and Dr. Joseph Mazza.
Mr. Martin Friedman, for Federal Pater.
Mr. Dominic Presto, for Fred Rolter and Frank Burian.
Mr. James V. Zimmerman, for Emma and Otto Knissel.
Messrs. Venino & Venino, for Stanley Atkins (Mr. Otto Veniro, appearing).
Messrs. Goldberg & Carlin, for Sportland Route 3 Corporation, Charles Eicholz, Aldys Corporation et al. (Mr. Walter Goldberg, appearing).
TRAUTWEIN, A.J.S.C.
This case involves the complex and oft-times perplexing issue of title to lands in the meadowlands. Appellants have challenged respondent's mapping procedure of title to meadowlands as depicted on the respondent's maps.
*250 Appellants now move for partial summary judgment. They ask this court to find as a matter of law that both respondent's use of the "hatched" area legend and its failure to designate which, if any, of the prior riparian grants it recognizes as valid on the maps promulgated, filed and published pursuant to N.J.S.A. 13:1B-13.1 et seq. violate the letter and spirit of that statute.[1]
These maps represent the most recent attempt by the State to properly manage the riparian assets of the school fund trust. Since 1894 (see L. 1894, c. 71) riparian lands have been designated as trust assets for the support of public schools. See, e.g., N.J. Const. (1844), Art. IV, § III, par. 6; N.J. Const. (1947), Art. VIII, § IV, par. 2; N.J.S.A. 18A:56-5 ("All lands belonging to this state now or formerly lying under water are dedicated to the support of public schools * * *")
Thus, the State, as represented by respondent Council, has a solemn duty to preserve these assets. However, it cannot act in a manner which violates the more fundamental duties of a sovereign to act reasonably and in a manner which least harms its citizens.
The past record of administration has been at best uneven. Compare L. 1851, p. 335 (Wharf Act), with L. 1869, c. 383, § 3; L. 1891, c. 124; see generally, New Jersey *251 Legislature Joint Study Commission on Riparian Lands, Report and Recommendations, 7-9 (1963).
After years of confusion, uncertainty and severe hardship to meadowland owners, the New Jersey Supreme Court, in O'Neill v. State Highway Department, 50 N.J. 307 (1967) established a new, clearer definition of what the State could claim as riparian lands. The court held (at 324) that all lands now or formerly flowed by the mean high tide are riparian lands. This definition is incorporated in the statute, see N.J.S.A. 13:1B-13.3. The court also suggested to the State that
* * * [A]s a matter of good housekeeping, the appropriate officers of the State should do what is feasible to catalogue the State's far-flung holdings * * * [at 320]
The Legislature responded to this suggestion by passing L. 1968, c. 404; N.J.S.A. 13:1B-13.1 et seq. The pertinent statutory sections provide:
The council [respondent] is hereby directed to undertake title studies and surveys of the meadowlands throughout the State and to determine and certify those lands which it finds are State owned lands. [N.J.S.A. 13:1B-13.2]
Upon completion of each separate study and survey, the council shall publish a map portraying the results of its study and clearly indicating those lands designated by the council as State-owned lands. [N.J.S.A. 13:1B-13.4]
Pursuant to these statutory directions and others (see N.J.S.A. 13:1B-13.3), respondent on January 14, 1970 published a two-part map, more commonly known as the "grey and white" map.[2]
In an earlier case, State v. Council in the Division of Resource Development, (Docket L-12561-68, September 8, *252 1971), this court found that this map was not prepared in accordance with the statute, particularly N.J.S.A. 13:1B-13.3, and ordered it suppressed. Though another part of that order was modified on appeal, see State v. Council, 60 N.J. 199 (1972), the suppression of the map was not appealed by respondent. Subsequently, respondent compiled pertinent data for the publication of new maps. On July 10, 1973 it approved and published seven base maps and overlays. By the end of the procedural history (as developed below), respondent had approved and published 36 maps which encompassed all of the Hackensack Meadowlands.
The root cause of the vexing and concededly difficult problems in this case lies buried in man-made acts of direct imposition of fill, etc., which artificially changed the physical characteristics of areas of the meadowlands. On the maps the meadowlands are characterized as either upland (areas above mean high water), or riparian (areas now or formerly below mean high water), or "hatched" (areas of filled meadow adjacent to virgin meadow, indicating a probable claim that the filled area was probably once tide-flowed to approximately the same extent, percentage-wise, as are adjacent, unfilled meadows at the present time). Though each category should logically and mutually exclude the other, the last one ("hatched") does not. Rather, it means that a portion of the land so labeled might at some time have been flowed by mean high tide. "Hatching" thus represents a possible claim by the State to some or all of those lands. It is a legend suggesting mixed ownership. It most certainly is not a claim clearly indicating ownership; it is, rather, an equivocation.
Respondent used a comparative, quantitative, analytical procedure in determining whether an area should bear the legend "hatched." The "hatching" procedure, described below, was used to determine the riparian "claim" only on a filled meadowland tract which adjoined an unfilled, virgin meadowland tract.
*253 According to respondent's experts, the prior maps of the filled meadowlands were examined for tidal stream patterns. If a tidal stream pattern was found, it was compared with the tidal stream pattern of the adjoining, unfilled virgin meadowland. Then, after analyzing and comparing the vegetation data and prior maps of both the filled and unfilled meadowland, respondent's expert would decide if all of this data revealed that there may be some riparian land in the virgin meadowland. Then, by extrapolating the data from the virgin meadowlands, respondent's expert concluded that a riparian claim should be laid in the filled meadowland tract to the same extent as that existing in the virgin meadowland tract. Upon obtaining this result, the filled meadowland was marked "hatched."
On July 19, 1973 appellants filed a notice of appeal in the Appellate Division pursuant to R. 2:2-3(a)(2). They asked the Appellate Division to review respondent's action, i.e., the approval and publication of the maps. They also sought by motion, filed with their notice of appeal, to have the administrative record supplemented. See R. 2:5-5(b).
Respondent then moved before the Appellate Division to consolidate this case with an appeal of consolidated meadowlands cases arising from the construction of the New Jersey Sports Complex. These cases, New Jersey Sports and Exposition Authority v. Bailey et al., (Docket L-20954-72), involved similar tidelands questions.
The Appellate Division granted both motions and issued the following order:
This consolidated appeal is remanded to the Law Division for the purpose of supplementing the administrative record for appellate review. The Assignment Judge of Bergen County, or such Judge as he may designate, is directed to conduct such proceedings and to make appropriate findings of fact and conclusions of law to be submitted to this court for determination of the following issues:
(1) Whether the maps published by respondent were prepared in accordance with the requirements of N.J.S.A. 13:1B-13.1 et seq. and specifically N.J.S.A. 13:1B-13.3. and
*254 (2) Were they promulgated and adopted in accordance with the provisions of N.J.S.A. 13:1B-13.4.
Appellants assert that on the basis of this order this court has the jurisdiction to grant their motion. Respondent contends that the Appellate Division order contemplates that the remand should be only a large-scale discovery proceeding. Moreover, respondent contends that this court can only make recommended findings of fact and conclusions of law.
While it is true that any findings of fact and conclusions of law are subject to appellate review, see R. 2:2-2, 2:2-3, 2:3-4, the language of the Appellate Division's order is clear. The court "is directed to conduct such proceedings and to make appropriate findings of fact and conclusions of law." I find that the order's direction is explicit; there is no mention of recommended findings of fact and conclusions of law. I therefore find that the court has jurisdiction under the remand order to rule on the appellants' motion.
Appellants' motion presupposes a lack of genuine material fact (see R. 4:46-2). It is their position that this lack of a material factual issue flows from the plain meaning of N.J.S.A. 13:1B-13.4, i.e., the phrase, "clearly indicating," means that as a matter of law the maps can only bear two legends: (1) state-owned (riparian lands), and (2) private property (upland). Thus, respondents' use of the hatched-marked legend is an additional category the statute sought to avoid.
Appellants buttress their argument by classifying the statute, N.J.S.A. 13:1B-13.1 et seq., as remedial legislation. They contend that in light of the mischief O'Neill attempted to curtail and O'Neill's explicit suggestion, the statute was designed to eliminate the slandering of title by respondents' use of a vague legend. Moreover, appellants assert that it is the duty of the State, as a benign sovereign, to end the confusion and uncertainty on the tidelands problem by clearly noticing various property owners as to the status of their property vis-a-vis the State's riparian claim. *255 For the State to do otherwise, appellants argue, would be a continuation of economic hardship to those property owners in question and would be contrary to a fundamental sense of fair play the State owes its citizens.
Respondents raise two grounds of opposition: (1) there is an issue of genuine material fact which precludes the court from granting summary judgment, or, (2) appellants' motion, if granted, would result in an unconstitutional application of the statute because it could either reduce the State's trust fund assets (its riparian lands), and outcome clearly prohibited by common law, e.g., Henderson v. Atlantic City, 64 N.J. Eq. 583 (Ch. 1903); In re Camden, 1 N.J. Misc. 623 (Sup. Ct. 1923), or expand their trust assets and take property without just compensation.
Respondents apparently conclude that because the hatched-marked areas represent mixed ownership, there is a factual issue, i.e., who owns the land.
While the court does not attach a malicious intent or malevolent heart to the State's methodology  indeed, it appears to be the good faith effort of persons required to perform a difficult task without ample resources  there can be no doubt that the hatched-marked legend neither creates a genuine factual issue nor comports with the statute. I find that though there may be a real question as to the extent of the State's claim in these areas, there is no factual issue as to whether the State marked these areas as upland or riparian, as mandated by the statute, N.J.S.A. 13:1B-13.1 et seq. The most that can be said for what the State did when it "hatched" an area was to publicly announce that ownership was "questionable." Indeed, the expression "questionable" has been used by counsel for the State on innumerable occasions in oral argument before this court where applications for withdrawal of condemnation deposits have been heard.
Thus, the next question facing the court is: Does the existing record adequately support a motion for partial summary judgment? A careful examination of the affidavits before the *256 court is required, Devlin v. Surgent, 18 N.J. 148 (1955); State v. South Amboy Trust Co., 46 N.J. Super. 497 (Law Div. 1957), so that the court, in a most judicious business-like manner (see, e.g., Rothman v. Silber, 90 N.J. Super. 22 (App. Div. 1966); New Jersey Highway Authority v. Currie, 35 N.J. Super. 525 (App. Div. 1955), can, if warranted, expeditiously grant the relief sought. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
The record here is sufficient to support the motion. Both the affidavits offered, particularly that of respondent council's expert and the excerpts from the depositions of its other experts, and the exhibits submitted illuminate the methodology employed by the respondent. The sum of this record is quite clear; the respondent intentionally added a category of land description to the descriptions required by statute.
The posture of this case is not analogous to the record facing the court in Jackson v. Muhlenberg Hospital, 53 N.J. 138, 139 (1969). There the court expressed concern over granting summary judgment on an inadequate record where such a decision would involve highly complex and significant nonjudicial policy considerations. The court wisely chose not to enter the treacherous area of liability for damages resulting from blood transfusions without first knowing what the effect its decision would have on this crucial segment of medical treatment. In the present case the statutory framework has already been implemented. All that is needed is a realistic assessment of the problem.
All of the above is even more instructive because appellants seek a partial summary judgment. The court may, pursuant to R. 4:42-2, "direct the entry of final judgment upon less than all of the claims only if it determines that there is no just reason for delay." Though there are a variety of arguments made against accepting these maps, appellants' relief could only serve to clarify the remaining issues for trial. Such a clarification is consistent with the spirit and purpose of our judicial system, i.e., "to facilitate the granting of justice *257 and to bring about an impartial and expeditious determination of the essential merits of the issues between the parties." Devlin v. Surgent, supra, 18 N.J. at 153. The court is mindful of the directions provided in Judson v. Peoples Bank & Trust Co. of Westfield, supra. The court there stated that
* * * [The] standards of decision governing the grant or denial of a summary judgment emphasize that a party opposing a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact. At the same time, the standards are to be applied with discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one.
Thus it is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact. 6 Moore's Federal Practice, par. 56.15(3). The phrasing of our rule, R.R. 4:58-3, slightly different from Federal Rule 56(c), underscores this in the requirement that the absence of undisputed material facts must appear "palpably." All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated. Templeton v. Borough of Glen Rock, 11 N.J. Super. 1, 4 (App. Div. 1950). And it is not to be concluded that palpably no genuine issue as to any material fact exists solely because the evidence opposing the claimed fact strikes the judge as being incredible. Arnstein v. Porter, 154 F.2d 464, 469 (C.C.A. 2 1946). Issues of credibility are ordinarily for the trier of fact, and the judge does not function as a trier of fact in determining a motion for summary judgment. Where the judge questions the inherent credibility of the matter offered in opposition there are other alternatives to the rejection of the matter and the grant of the motion. Under R.R. 4:58-5 "leave to proceed may be given unconditionally, or upon such terms as to giving security, or time or mode of trial, or otherwise, as may be deemed just." [at 74-75 of 17 N.J.]
These directions are now embodied in R. 4:46-1 et seq.
The court has carefully examined the submitted affidavits, depositions and exhibits (see R. 4:46-2). I find that there is no genuine issue of material fact. Rather, it becomes the duty of the court to determine if under the statute the appellant's motion should be granted as a matter of law.
The court has already had one oportunity to examine this statute when it came before the court as part of a larger *258 legislative scheme, the Hackensack Meadowlands Reclamation and Development Act, L. 1968, c. 404, in Meadowlands Reg. Dev. Agency v. State, 112 N.J. Super. 89 (Ch. Div. 1970); aff'd 63 N.J. 35 (1973). In their affirmance the Supreme Court noted that N.J.S.A. 13:1B-13.1 et seq. "establishes a procedure for the resolution of title problems in meadowlands properties throughout the State." 63 N.J. at 39.
In establishing these procedures the legislative language is explicit: the State must clearly indicate its holdings. The word "clearly" is the crucial word in the statute. It commonly means in a clear manner. Webster's Dictionary (3 ed. 1972). Webster defines "clear" as "easily understood, without obscurity or ambiguity." Its legal definition is the same: "visible, unmistakable, in words of no uncertain meaning." Black's Law Dictionary (3 ed. 1971). Thus, when "clearly" acts as a modifier, it is an adverb. Here its purpose is to sharpen an ambiguous term. Though "indicating" could mean many things, when modified by "clearly," it must mean an unambiguous delineation.
This type of construction is mandated by the language of N.J.S.A. 1:1-1 which, in setting forth the general rules of construction, require that
* * * words and phrases should be read and construed with their context, and shall unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language * * *.
Placing both the common meaning of the phrase "clearly indicating" in the context of the statute, I find that the legislative intent was to remedy the perplexing problem of tideland ownership. See also, N.J.S.A. 13:17-1 (1968).
I find that the statute is remedial. See 2 Sutherland, Statutory Construction (3 ed. 1943), § 3302. Its clear purpose was to establish the procedure suggested in O'Neill.
It would fly in the face of both experience and reason to conclude from the legislative history, the history of tidelands *259 in this State, O'Neill and the persuasive arguments of appellants that this statute creates the third category of "hatched-marked" areas.
Respondent argues that "hatched" is really a term of state ownership. However, this statement assumes the issue. The ultimate resolution of ownership is to be resolved in quiet title actions. All the statute requires is notice  clear, unambiguous notice  to the landowners of this State that they do or do not have title free from the State's claims. The use of the hatched-marked areas transforms the legislative intent of unequivocal notice to an ambiguity which is both regressive and unfair.
Moreover, even if one assumes that those "hatched" areas can be more specifically delineated by a notice of motion to respondent,[3] this does not aid those landowners whose titles are slandered by the "hatched" legend but who are not now in litigation. Rather than force those landowners to institute the appropriate proceedings, the better result would be to make respondent designate on all the "hatched" areas. Thus, all landowners would be "free," within the normal legal requirement of title conveyance to sell, lease or otherwise dispose of their land  without any additional time or expense.
*260 Finally, respondent attempts to show that the result appellant seeks would be an unconstitutional application of the statute. Respondent cites the legislative history, which at best is ambiguous, and certain veto messages of Governor (now Chief Justice) Hughes. In these messages the then Governor quite correctly recognized that the statutes proposed could divest the State of its interest, a result prohibited by the common law.[4] See Henderson v. Atlantic City, supra; In re Camden, supra. However, the statute, N.J.S.A. 13:1B-13.1 et seq., does not divest the State of its interest. It merely requires the State to define its interest in unequivocal terms. The statute is a rational solution to the perplexing problem of the lands administration.
I therefore find as a matter of law that N.J.S.A. 13:1B-13.7 et seq. is a remedial statute. In particular, N.J.S.A. 13:1B-13.4 requires only two classes of designation, not three. Respondent is ordered to prepare and publish a new overlay which clearly indicates the State's riparian claim for each map of the areas heretofore designated as "hatched."[5] *261 These new overlays are required within 120 days of the date of this order. Much of what has been said on the question of the "hatched" areas applies to appellants' contention on riparian grants. At present the maps do not reflect any grants of riparian lands by the State, unless one draws the negative inference from the "hatched" or riparian legends that respondent council does not think there are any valid riparian grants in these areas. See N.J.S.A. 12:3-1 et seq.
I therefore order respondent to prepare and publish an overlay for each map depicting which riparian grants the State recognizes as valid. Respondent has 120 days from the date of order to prepare those overlays.
NOTES
[1] Other appellants raise a variety of well pleaded arguments. They contend that the published maps are not maps but photographs and as such do not meet the statutory requirement to publish maps (see N.J.S.A. 13:1B-13.4 (1968)); that the use of the "hatched areas" legend deprives the property owners of their property, in violation of both the procedural requirements and substantive commands of the due process clause of the Fourteenth Amendment; that the use of the hatched areas legend in only certain of the map quadrangles represents an arbitrary, capricious classification of that property which violates the Equal Protection Clause of the Fourteenth Amendment. While these arguments may have some merit at this particular posture of this case, it is, for the reasons expressed infra, not necessary for the court to reach them.
[2] It was so-named because the white area indicated that the lands were upland; the grey area indicated the State claimed that lands as riparian.
[3] At present various state agencies and authorities have condemned substantial acres of the Hackensack Meadowlands. The "hatched" legend appears on some of this acreage.

In an attempt to allow the upland owner to withdraw all the upland money deposited by the condemning authority, the court, after application of the upland owner (see N.J.S.A. 20:3-23) has ordered the State to clearly designate its riparian claim in the "hatched" areas.
This has allowed the upland owner to withdraw the upland deposit before the condemnation action is completed. Thus, any financial hardship created by the taking may be mitigated by the early withdrawal of condemnation funds. Unfortunately, the ultimate resolution of title does not obtain by this process because the State, in response to a court order to designate, expresses its claim in terms of a percentage of gross acreage but with the expressed inability to describe that percentage by metes and bounds.
[4] Both of the veto messages respondent relies on (Veto Message, Assembly Bill 44, January 12, 1965; Veto Message Assembly Bill 605, December 13, 1965) deal with the Legislature's attempt to change the administration of riparian grants by removing most of the checks the Governor or other interested state officials might exercise if they were part of the system. Quite correctly both bills were characterized by the Governor as complete divestive statutes which eliminated proper supervision. Moreover, the Governor thought one bill was premature (Veto Message, Assembly Bill 44, at 5-6) since the commission to study the problem had yet to report by the time of the veto message; and by the time of the second veto message (Assembly Bill 605), the Legislature's own commission stated unequivocally that the bill (605) was unconstitutional.

Finally, O'Neill, supra, had not yet been decided. Its wide-sweeping effect on the tidelands problem might have mooted the legislative attempts.
[5] In marking its claim respondent should consider the effect of Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), as it may apply to the State riparian claim.