182 N.J. Super. 575 (1982)
442 A.2d 1051
VELSICOL CHEMICAL CORPORATION, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION ET AL., DEFENDANT-APPELLANT-CROSS-RESPONDENT. INMONT CORPORATION, AN OHIO CORPORATION, PLAINTIFF,
v.
JOHN CLAUSE, DEFENDANT-RESPONDENT AND CROSS-APPELLANT,
v.
STATE OF NEW JERSEY ET AL., DEFENDANT-INTERVENOR AND APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1981.
Decided February 2, 1982.
*578 Before Judges BOTTER, ANTELL and FURMAN.
Bertram P. Goltz, Jr., Deputy Attorney General, argued the cause for appellant (James R. Zazzali, Attorney General, attorney; John J. Degnan, former Attorney General; Erminie L. Conley, Assistant Attorney General, of counsel).
Lorraine S. Teleky argued the cause for respondent-cross-appellant Velsicol Chemical Corporation.
Alfred A. Porro, Jr., argued the cause for respondents John Clause and Oak Point Excavation and Foundation Corporation.
The opinion of the court was delivered by FURMAN, J.A.D.
The State appeals in these consolidated actions from judgment quieting title in plaintiff Velsicol Chemical Corporation to a 33-acre parcel in the Hackensack meadowlands bordering Berry's Creek, except for existing or former tide-flowed waterways, and quieting title in defendants John Clause and Oak Point Excavation and Foundation Corporation to a nearby, but not contiguous, 30.9-acre parcel, except for existing or former tide-flowed waterways. From the portion of the judgment quieting title in the State to a relocated tidal creek on its 33-acre parcel Velsicol cross-appeals.
*579 Velsicol and Clause were both in peaceable possession. The State claimed title to substantial acreage on both properties as tide-flowed riparian lands. In New Jersey, State ownership of lands now or formerly flowed by tide water up to the high water line is long established. O'Neill v. State Hwy. Dept., 50 N.J. 307, 322-323 (1967); Bailey v. Driscoll, 19 N.J. 363 (1955); Schultz v. Wilson, 44 N.J. Super. 591 (App.Div. 1957), certif. den. 24 N.J. 546 (1957). The high-water line is defined as "the line formed by the intersection of the tidal plane of mean high tide with the shore." O'Neill, 50 N.J. at 323.
In a 19-day trial before Judge Petrella the State's primary reliance was upon maps and overlays showing the incidence of mean high tide flow, based upon infrared aerial photographs. The spectral reflectance patterns of the prevalent reedlike phragmites communis vary with differences in the water supply. Green phenotypes or signatures indicate low-lying marshland regularly flowed by the tide; pink signatures indicate so-called mid-marshland, and red signatures indicate high marshland above regular tidal flow. The State limited its claim to the areas of green signatures. On appeal it asserts that its claim is "conservative" and that the theoretical mean high-water line, if determined with precision, would fall within the areas of pink signatures.
This methodology of biological delineation by infrared photography was adopted by the State in order to meet its obligation to map its tidal claims in the Hackensack meadowlands pursuant to N.J.S.A. 13:1B-13.1 et seq., enacted in 1969. The Supreme Court approved mapping by biological delineation in Newark v. Natural Resource Council, etc., 82 N.J. 530 (1980), as complying with the statutory mandate. Justice Schreiber, in a dictum, left unresolved the evidentiary effect of the State's maps, thus prepared, in any subsequent quiet title action:
Although the State may seek to introduce these maps as evidence of its sovereign ownership claims in later quiet title suits, the sole issue here concerns whether the maps comply with the guidelines established in Title 13. We cannot and do not find here that the State's claims are legally warranted in whole or in *580 part as against other parties asserting ownership. We do not broach the question of what evidentiary effect these maps should be given in subsequent quiet title suits involving private owners. The question remains open as to whether they will satisfy either the burden of production or persuasion which the State may have in those cases.
In this consolidated litigation the pretrial order listed as an abandoned legal issue:
To the extent herein raised and subject to paragraph 2 above, the validity of the various photo maps of the Hackensack Meadowlands offered by the State as a proper performance of the mandate of Title 13 of the Revised Statutes, and whether the scientific techniques used in formulating the various photo maps of the Hackensack Meadowlands are valid, proper, pertinent, material, relevant and competent for the purpose intended, are hereby removed as issues in this proceeding, without prejudice inasmuch as the same issues shall be tested and tried in a plenary proceeding entitled "City of Newark, et als. v. Natural Resource Council, et al.," Superior Court of New Jersey, Appellate Division, Docket A-3311-72, wherein exclusive jurisdiction is presently laid.
Paragraph 2 of the pretrial order provided that the probative value of the State's "photo map" of the area should abide the trial.
During the trial the State's maps showing biological delineation of mean high-tide flow were admitted into evidence. But Judge Petrella sustained an objection by Velsicol and Clause, the record owners of the respective parcels, to the admission into evidence of the report of Earth Satellite Corporation, which was based upon its analysis of the infrared aerial photography, of natural color photography and of field observations, in the absence of any representative of Earth Satellite. That ruling was on the third day of trial. No Earth Satellite representative or other qualified witness to support the admission of the report was thereafter produced, nor is appeal brought from the ruling excluding the report from evidence as inadmissible hearsay.
Dr. Feinberg, an environmental scientist employed by the State and its only expert witness during the trial, testified that the State maps and overlay were based upon the excluded Earth Satellite report; that he had accepted its botanical overlays but had independently verified tidal access to the areas delineated as tide-flowed, and that he had necessarily relied upon the excluded report in rendering his expert opinion testimony. A wetlands *581 plant ecologist, who was a witness on behalf of Velsicol and Clause, testified without rebuttal by the State that chemicals and pollutants in the soil, such as mercury in heavy concentrations on the Velsicol property, distort the spectral reflectance patterns of phragmites communis.
In his oral opinion Judge Petrella concluded that the State had failed in its burden of proof that the disputed areas on the Velsicol and Clause parcels were tide-flowed, "[a]bsent testimony by experts who compiled and prepared the Earth Satellite report and established the botanical infrared analysis approach....," or other satisfactory evidence "of actual regular tide flow." The State appeals from that holding as in conflict both with the Newark opinion and the pretrial order.
We disagree with the State's contention. Under the pretrial order the scientific validity of the State's biological methodology was removed as an issue. But that did not exempt the State from proving how and based upon what data its maps showing biological delineation of mean high-tide flow had been prepared, with the opportunity for cross-examination. The Earth Satellite report would have been the linchpin of the State's case. Without one or more witnesses responsible for its preparation testifying to Earth Satellite's application of the biological methodology, its gathering, collating and analysis of scientific data, the maps and overlays based upon the report were insufficient to sustain the State's burden of proof. State v. Dantonio, 18 N.J. 570, 578-579 (1955), exempting the State from reproving the scientific validity of radar speed detection at each trial, is distinguishable.
The State's only other contention on appeal is that Judge Petrella erroneously assigned it the burden of proof. In a quiet title proceeding, the burden of proof rests with the party not in peaceable possession, in this case the State. Warner v. Smith, 115 N.J. Eq. 572, 573 (E. & A. 1934); N.J.S.A. 2A:62-1, 2. But that general rule was modified by O'Neill, which established that in tidelands litigation the party challenging the existing *582 physical scene bears the burden of proof, whether in peaceable possession or not. The O'Neill holding is based upon "practical necessity", in recognition of the difficulty of proof of tideland status prior to man-made or natural changes.
In our view, no shift of the burden of proof was mandated by O'Neill. Both parties sought to identify, rather than to challenge, the existing physical scene. Specifically, in their extensive proofs based upon surveys, tidal datums, aerial photography and field observations, Velsicol and Clause did not claim any lands below the mean high-water line fixed by their conventional methodology.
The State's argument assumes that its biological delineation of the physical scene was prima facie accurate, shifting the burden of proof to the property owners of record to rebut it. That argument must be rejected. The State presented proof of one version of the existing physical scene based upon its biological methodology. Velsicol and Clause presented proof of a conflicting version of the existing physical scene based upon their conventional methodology. According to an employee of the National Oceanographic Survey who testified, no methodology for mapping tidal boundaries is recognized as more accurate or reliable than tidal datums. We cannot conclude that the State's biological delineation established the existing physical scene, shifting the burden of proof to Velsicol and Clause.
Velsicol's cross-appeal poses a novel issue in tideland law in this State. A narrow, unnamed creek with a fresh-water source meandered across Velsicol's property, subject to tides from Berry's Creek. Velsicol dumped fill, blocking the creek and diverting it to the south of the filled area. On appeal Velsicol does not challenge the State's title to the now dry former creek bed. In claiming ownership of the relocated tidal creek, it relies on general principles that artificial changes, whether by the State or a private owner, are without effect in determining tideland status and, by way of parallel, that the State cannot gain title to upland by ditching or dredging or lose title by filling in or *583 drying up a tide-flowed waterway. O'Neill, 50 N.J. at 324; Wildwood Crest v. Masciarella, 51 N.J. 352 (1968); Garrett v. State, 118 N.J. Super. 594 (Ch.Div. 1972).
The State's counter-argument is solely that, as determined by its biological methodology, the bed of the relocated tidal creek was formerly tide-flowed. That counter-argument fails in view of our affirmance of Judge Petrella's conclusion that the State's proofs on that issue were insufficient.
In resolving in favor of the State the issue of ownership of the relocated tidal creek, Judge Petrella attached paramount significance to the common rights of navigation and fishery which state title to tide-flowed waterways safeguards. However, there was no evidence in the record of any navigation or fishery in fact on or above the Velsicol property along the relocated tidal creek.
State ownership of tide-flowed lands does not hinge upon navigability or fishability. The law is identical and the State's tidal holdings extend to tidal marshes as well as to major waterways.
A parallel issue was alluded to in O'Neill. The State had diverted Blackman's Creek, a tidal stream, and filled in the original channel. In remanding for retrial with the burden of proof resting upon the party challenging the existing physical scene, the Supreme Court commented:
We note that on the record as it now stands, certain portions of the tract are clearly owned by the State, and some apparently by plaintiff. For example, the bed of Blackman's Creek and of another natural waterway seem plainly to be the State's. [50 N.J. at 328]
Whether this reference is to the former bed of Blackman's Creek or to the present bed is not clear in the context of the opinion.
We conclude that, by its artificial change in the channel of the unnamed tidal creek, Velsicol was not divested of its ownership of the underlying land across which the creek now flows and that its title now encompasses the creek itself, subject *584 to applicable statutory restrictions on the diversion or damming of a natural waterway and to civilly enforceable obligations to adjoining property owners.
Our holding does not extend to distinguishable factual circumstances  for example, artificial opening up of a channel across private property to gain the benefits of tidewater for navigation, fishery and other recreational use, where there had been no prior tidal access. Nor do we adjudicate the tideland status of an artificially diverted tidal waterway on which common rights of navigation and fishery had in fact been exercised.
On the State's appeal we affirm the judgment below. On Velsicol's cross-appeal we reverse and direct the entry of judgment quieting title to the relocated tidal creek in Velsicol. We do not retain jurisdiction.